SEALED BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT

for the

Northern District of California

**FILED**

Jun 03 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| SANDRA ANN ZUNIGA | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

Case No. 3:20-mj-70698 JCS

_____
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of <u>March 2014 through January 2020</u> in the county of <u>San Francisco, San Mateo</u> in the <u>Northern</u> District of <u>California</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956 (h) | Conspiracy to Launder Money |

Max. Penalties: Up to 20 yrs. imprisonment; $500,000 fine or twice the value of the property involved in the transaction; 3 yrs. supervised release; $100 mandatory special assessment.

This criminal complaint is based on these facts:

See attached Affidavit of FBI Special Agent Tyler Nave.

☐ Continued on the attached sheet.

Approved as to form _____
AUSA Alexandra Shepard

s/
*Complainant's signature*

Tyler Nave, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. Rule 4.1 by telephone.

Date: ____6/3/2020____

_____
*Judge's signature*

City and state: ____San Francisco, CA____

Hon. Joseph C. Spero, Chief U.S. Magistrate Judge
*Printed name and title*

Print　Save As...　Attach　Reset

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**</u>

I, Tyler Nave, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state the following:

**I.      INTRODUCTION AND AGENT QUALIFICATIONS**

1.      I submit this affidavit in support of a criminal complaint against Sandra Ann ZUNIGA. As set forth below, there is probable cause to believe ZUNIGA engaged in a conspiracy to launder money in violation of Title 18, United States Code, Sections 1956(h), by participating in a scheme to launder the proceeds of honest services wire fraud from at least as early as March 2014 until at least as late as January 2020.  ZUNIGA participated in this scheme with Mohammed NURU, the former Director of the San Francisco Department of Public Works, and other co-conspirators known and unknown to the government.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I am a Special Agent of the FBI and have been so employed since March 2009.  I am sworn and empowered to investigate criminal activity involving violations of federal law.  I am currently assigned to FBI's San Francisco Division Public Corruption Squad, which investigates abuse of public office in violation of criminal law, which includes fraud, bribery, extortion, conflicts of interest, and embezzlement.  My investigative experience includes, but is not limited to: conducting wire communication interceptions; interviewing subjects, targets and witnesses; executing search and arrest warrants; handling and supervising confidential human sources; conducting surveillance; and analyzing phone records and financial records.

3.      During my employment with the FBI, I have received formal classroom and field training at the FBI Academy in Quantico, Virginia and graduated from the New Agent Training program.  My training and experience includes, but is not limited to, public corruption, hate crimes, human trafficking, and foreign counter-intelligence.  I have also received additional

formal and on-the-job training from the FBI, as well as from the United States Attorney's office and other federal agents who have done extensive work in the areas of financial crimes and public corruption. I have participated in several investigations involving public corruption, bribery, and fraud, and I have been the lead agent on several of those cases. I have worked on multiple wiretaps while investigating public corruption, white-collar crime, and national security cases. I have received formal training in wiretaps at the FBI academy in Quantico, Virginia as well as on the job training while working on wiretaps in active investigations in multiple field offices.

4.      To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including, but not limited to, physical and electronic surveillance, witness interviews, various types of infiltration to include confidential human sources, and cooperating sources. I have utilized pen register and trap and trace devices, mail covers, pole cameras, stationary video recording vehicles, undercover operations, and audio and audio/video recording devices.

5.      I make this Affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources, among others:

    a.   my experience investigating money laundering, honest services wire fraud and other illegal activity relating to public corruption;

    b.   oral and written reports about this investigation that I have received from federal agents, including other agents of the FBI;

    c.   physical surveillance conducted by the FBI, the results of which have been reported to me either directly or indirectly;

    d.   information obtained from undercover agents;

    e.   recorded conversations; and

    f.   confidential human sources.

6.     The conversations I summarize below were largely derived from various meetings and intercepted communications. Collectively, these meetings, calls, and communications were documented in FBI reports and summaries. These reports and summaries describe recorded conversations involving subjects of the investigation, during which the subjects at times use code words and/or cryptic language to disguise conversations about their criminal schemes and related activities. The reports are summarized based on agents' interpretations of the conversations. Some of these reports and summaries contain interpretations of coded words, cryptic language, and vague identifiers. It may be that subsequent review of the recorded conversations and verbatim transcripts may show changes from the summaries initially prepared. Quotations from the recordings are based on informal transcriptions of portions of certain key recordings, which may not be exactly the same as formal transcriptions that are later prepared.

## II.     APPLICABLE STATUTES

7.     Under Title 18, United States Code, Section 1956(h), it is unlawful to conspire to commit an offense under Title 18, United States Code, Sections 1956 or 1957.

8.     Under Title 18, United States Code, Section 1956(a)(1), it is unlawful for an individual to conduct or attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to facilitate or conduct specified unlawful activity, to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity.

9.     Under Title 18, United States Code Sections 1956 and 1961(1), "specified unlawful activity" includes any act which is indictable under Title 18, United States Code Section 1343 (wire fraud).

## III.     PROBABLE CAUSE

### A.  Overview

10.     There is probable cause to believe that from at least as early as March 2014, until at least as late as January 2020, Sandra ZUNIGA conspired with Mohammed NURU, the former Director of Public Works for the City and County of San Francisco, and others known and

unknown to the government, to launder the proceeds from honest services wire fraud schemes engaged in by NURU and others.

11.     In furtherance of the conspiracy, ZUNIGA deposited over $135,000 in cash and checks into her JP Morgan Chase checking account.  She then, contemporaneous with these cash and check deposits, paid the mortgage on a portion of a vacation property owned by NURU on Lodoga Stonyford Road in Stonyford, California for a period of at least three years, paid a contractor performing work on NURU's vacation property, and wrote checks to NURU.  Probable cause exists that ZUNIGA knew that the source of the funds she was transacting were the proceeds of illegal activity.  In fact, the funds were the proceeds of NURU's honest services wire fraud.

12.     ZUNIGA deposited the aforementioned cash and checks at bank branches in the Northern District of California and elsewhere, and transmitted the aforementioned payments in interstate or foreign commerce.  The transactions were designed in part or in whole to conceal and disguise the nature, source, and ownership of the funds.

**B.  Individuals**

13.     Sandra ZUNIGA is currently the Director of the City of San Francisco's Fix-It Team and the Director of the Mayor's Office of Neighborhood Services.  Prior to becoming the Director of the Fix-It Team in May 2016, ZUNIGA was the Assistant Deputy Director for Operations at the San Francisco Department of Public Works.  ZUNIGA has been employed by the City and County of San Francisco since at least 2008.[1]  As a public employee of San Francisco, ZUNIGA received training on ethics, conflicts of interest, illegal gifts, bribery, and other obligations of public officials in San Francisco.  ZUNIGA would have been aware of the general restrictions on NURU's ability to receive gifts and payments from people and businesses with business before the City.

---

[1] In or around the summer of 2018, ZUNIGA also took a second, part-time job with Amazon in its warehouse.

14.     ZUNIGA has been in a romantic relationship with Mohammed NURU since approximately 2009.  Mohammed NURU is the former Director of Public Works (DPW) for the City and County of San Francisco.  While still serving as Director of DPW, NURU was charged by Criminal Complaint with Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346) on January 15, 2020, and by a separate Criminal Complaint with False Statements in violation of 18 U.S.C. § 1001 on January 28, 2020.

15.     ZUNIGA and NURU live in separate residences in the San Francisco area but own a four-bedroom vacation home together on Black Diamond Road in Stonyford, California in Colusa County, near a vacation home owned by NURU on Lodoga Stonyford Road in Stonyford.[2]  ZUNIGA purchased the home herself in January 2016.  After the transaction closed, ZUNIGA added NURU to the title.  Documents indicate that at the time she added NURU to the title, ZUNIGA and NURU also purchased the lot next door to the Black Diamond property, which was owned by NURU's then-17-year-old son, a high school student.

**C.  NURU's Honest Services Fraud**

16.     Mohammed NURU engaged in a scheme to defraud the public of its right to the honest services of public officials through bribery and kickbacks in breach of his fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts.

17.     NURU's scheme took a variety of forms.  In the January 15, 2020 Criminal Complaint, he was charged with participating in a scheme with restaurateur Nick Bovis to win a bid for a restaurant lease at San Francisco International Airport by bribing and/or paying a kickback to a public official, namely a member of the San Francisco Airport commission.

18.     Intercepted communications show that NURU has attempted to use his official position to benefit a billionaire developer in China with a multimillion-dollar project in San

---

[2] Although NURU's vacation home property is technically located in Stonyford, intercepted communications show that NURU and other subjects often refer to the vacation home as being in "Ladoga" or "Lodoga" (Lodoga, CA is next to Stonyford, CA).  For purposes of this affidavit, and to avoid confusion I use Lodoga to refer to NURU's vacation home, and Black Diamond Road to refer to their jointly-owned vacation home on Black Diamond Road in Stonyford.

Francisco, California. This individual has been identified by the FBI and is referred to herein as DEVELOPER 1. In exchange for travel and lodging, high-end liquor, and other gifts and benefits, NURU admitted to working behind the scenes to use his official position to help DEVELOPER 1 with developing a large, multimillion-dollar mixed-use project in San Francisco. The corrupt nature of this arrangement was corroborated by an encrypted message sent from NURU to DEVELOPER 1 on November 4, 2018, shortly after NURU had received luxury accommodations from DEVELOPER 1 during NURU's stay in China. The message from NURU stated: "Thank you very much for all your generosity while we were in China. We had a great vacation and my daughter had a wonderful time. I will do my very best to see that your project gets completed. Look forward to seeing you in San Francisco when you come."

19.     From approximately 2014 to 2019, NURU's Lodoga vacation home was built out by contractors largely from San Francisco, and more specifically contractors who had business at the time with the City and County of San Francisco. The work conducted by these contractors has largely been at no cost to NURU or at a subsidized rate. In normal traffic, the location is an approximately three and a half hour drive from San Francisco. It is highly unlikely that a contractor from San Francisco would, under normal circumstances, take a contract to work on a home in a location that includes a seven hour daily round-trip commute.

20.     One contractor who was sending workers to work on the vacation home, referred to here as CONTRACTOR 1, is the CEO and Vice President of a company that has received numerous contracts with the City and County of San Francisco, including a contract with DPW worth in excess of $2 million in 2018. CONTRACTOR 1 appears to have received behind-the-scenes support from NURU to resolve issues with a project to replace sidewalks on Van Ness Avenue in San Francisco.

21.     CONTRACTOR 2, a building permits expediter and construction contractor who is affiliated with NURU, similarly did work on NURU's Lodoga property between at least November 2014 and March 2017. I have reviewed documents showing that the total cost of CONTRACTOR 2's work on NURU's Lodoga property over time was in excess of $200,000.

22.     In addition, I have reviewed documents which show that CONTRACTOR 2 also did extensive work for free on NURU's home in San Francisco, California, from 2008 to 2020, worth in excess of $38,000.  In return for this work and other items of value provided to NURU, including travel described in further detail below, CONTRACTOR 2's companies obtained numerous contracts with DPW.

23.     The investigation has analyzed known financial accounts for NURU.  Although the investigation identified more than $200,000 that NURU has spent on home improvement (between approximately January 2017 and May 2019), to date no payments to CONTRACTOR 1 or CONTRACTOR 2 have been identified.  Based on my training and experience, and based on intercepted communications, I believe these contractors are providing labor and equipment for construction on NURU's vacation home for free or at a subsidized rate so they could continue to obtain city contracts, as well as receive NURU's support in resolving any issues that might arise with existing and future contracts with the City.

**D.  ZUNIGA's Knowledge of NURU's Honest Services Fraud Schemes**

24.     I have reviewed evidence which indicates that ZUNIGA knew of and at times benefitted personally from NURU's honest services fraud.

25.     In October 2018, ZUNIGA, NURU, CONTRACTOR 2, and others traveled to South America for approximately two weeks.  The trip included stays in Santiago, Chile, and Rio de Janeiro, as well as a stop at Iguaçu Falls.  I believe, based on the evidence I have reviewed, that CONTRACTOR 2 and others subsidized NURU's and ZUNIGA's expenses for that trip. Prior to the trip, on September 14, 2018, NURU told ZUNIGA that the trip would be his treat. He told her that "I just went and squared up all the financial stuff so…" ZUNIGA responded, "Oh god." NURU told her, "Yeah, so. But you don't have to worry about nothing. Everything taken care of. That's on me, so…" ZUNIGA responded, "Oh god, like nothing nothing? (laughs)."  NURU also laughed and said, "well I can talk to you about that, but you don't have to do anything (UI)."  ZUNIGA told him, "right now, ok."  And NURU responded, "Yup yup."

26. In a subsequent conversation on September 17, 2018, NURU and ZUNIGA discussed her concealing the nature of the trip from her colleagues at work. NURU told her, "We can get back to work, and nobody will know where you've gone." Then NURU told her, "At least they won't know you're gone with me." ZUNIGA told him, "Yeah, I'm just like, if they're gonna ask, I'm probably gonna answer, 'I'm just resting like I always do.'… NURU suggested she tell them that she was going to hang out with her family in Pittsburgh. ZUNIGA said, "Yeah I'll say something (UI) that's what I normally do anyways, so or I say, probably I'm like take time off and hang around because they know I don't leave my cats." Later in the conversation, ZUNIGA asked NURU how much money he thought she would need in South America – "It says lunch and dinner on your own kind of thing." NURU told her, "You don't need to worry too much. I got you covered. It's my treat."

27. Records indicate that ZUNIGA then flew business class to South America, at a cost of $4,707.41. Agents have reviewed ZUNIGA's financial accounts for the period June 2018 to October 2018 and were not able to identify any associated travel expenses for that amount. The group, including ZUNIGA and NURU, also stayed at the Ritz Carlton Hotel in Santiago, Chile for two nights. Records received from the Ritz-Carlton in Santiago, Chile, show the hotel reservation was under ZUNIGA'S name and that the room was paid for in cash. The room was occupied by two people. Based on my training and experience, I believe the other person was NURU. The cost of their stay at the Ritz-Carlton was 800,400 Chilean pesos, equal to approximately equal to $1,183 U.S. dollars at the time. A review of ZUNIGA's financial accounts indicate that she withdrew a total of only $193 in cash in the week before the trip, and a total of $469.67 in cash during the trip.

28. ZUNIGA later emailed a friend about the trip: "Last year I was so lucky to travel to Chile, Argentina, and Brazil. We didn't travel much when I was a kid, only 10+ hour drives to Mexico or Vegas, so I'm really enjoying being an adult and being able to see the world. It's amazing and nothing like people say places are. You really have to experience the world yourself, you know?"

29.     After returning from the trip to South America, and shortly before NURU left on a trip to China, discussed in further detail below.  ZUNIGA and NURU discussed NURU's financial problems.  During the conversation, NURU expressed his hope that a refinance of his San Francisco property would enable him to pay off his debts.  NURU told ZUNIGA that his "only problem right now is that I don't have any money, so I'm trying to figure that out…Yeah, went, I spent an hour looking through my safe, I always keep money there, so I found a little bit."  NURU then continued on to discuss his debts, which he said totaled $332,400.  Later in the call, they discussed buying an apartment building, and ZUNIGA asked, "How we gonna afford that?"  NURU said, "I don't know, just keep on investing.  I mean I'll be having a serious talk with [CONTRACTOR 2] on on this trip."  And ZUNIGA replied, "Oh good, maybe I can get a contract there."

30.     I reviewed texts that NURU and ZUNIGA exchanged in conjunction with this conversation.  During the call, NURU texted ZUNIGA a handwritten list of his debts, which included loans from "Tri County loan," believed to be a reference to a mortgage for NURU's home from Tri Counties Bank, a loan from an unidentified individual, credit card debt, and other debt.  The debts totaled $332,400.

31.     I have reviewed emails and wire intercepts showing that ZUNIGA assisted NURU with the design and furnishing of his vacation home, and also spent time there with NURU.  Given her involvement with the home, I believe it is likely that ZUNIGA was aware that contractors were working on the house for free or reduced rates.  In the same text string discussed above, NURU requested that ZUNIGA send him pictures of furniture, telling her, "Need to get the people to start looking," and "Sometime soon as I need the people to start looking before we arrive."  Based on the investigation thus far, I believe that "the people" NURU was referring to were people associated with CONTRACTOR 2, who helped pay for NURU's trip to China and purchased furniture there for the Lodoga home.  ZUNIGA then texted NURU a series of photos of furniture, including a small carved wooden house which she told NURU was a bed for her cats.

32.     Shortly after ZUNIGA and NURU returned from South America, NURU left on the aforementioned trip to China with his daughter and CONTRACTOR 2.  I believe, based on my review of the evidence, that CONTRACTOR 2 and DEVELOPER 1 paid for or heavily subsidized this trip to China, so that NURU would use his official position to help CONTRACTOR 2 and DEVELOPER 1 when needed.  On November 4, 2018, at approximately 9:21 p.m., NURU had a long call with ZUNIGA in which he described the trip, including the many gifts he received during this trip. NURU said that unlike on the way to China where he flew in first class, this time NURU flew business class back to San Francisco. NURU began by telling ZUNIGA about a wealthy friend of his who lived in China and how NURU and CONTRACTOR 2 stayed at his resorts during their vacation.  NURU said, "You know my friend that has the plane?...  Well I have a friend that has a, he's the fifth richest guy in China…  I know him through [CONTRACTOR 2], but anyway, so he's really rich, I mean, he's like, anyway we went to, we had uh we had dinner with him on, what day was that?  On Friday, oh no we had lunch with him on Friday and they ask 'so hey, what are you guys doing for the rest?'  We told him we were going to this little hot spring town where they have these hot springs and stuff… And he's like 'No, you're going to my hot spring.'  (UI) his people on the phone making phone calls and he has his (UI) he says 'My van is outside to take you to my resort'…  And we get there and they're like all these people, all these like agents with things in their ear and stuff all waiting for us.  We like 'oh shit, what's going on [CONTRACTOR 2]?'  (UI)…  Yeah, thing is we get there, they take us to our rooms and everything and they're, everybody's in their room and then as soon as I come out, they're like still outside our room.  I'm like 'Oh man, what's going on?'  And then they're like 'Uh, in ten minutes we're going to go take a tour of the whole place' You know, then we took a whole tour and everything.  They gave us (UI) it was a big, they have like a whole community center and basketball courts, swimming pools, yoga…  Yeah, he owns the whole, the whole spa and the hotel…  Yeah, we stayed, we stayed in uh we stayed at uh Seven Star Hotel, he owns it, Conrad, and then we stayed at the Park Hyatt, he owns that one.  And the last time I went with grandma we stayed at the Ritz-Carlton, yeah… "

33.     NURU then told ZUNIGA about how he is helping DEVELOPER 1.  NURU said, "He's a very nice guy.  We're helping him, I'm helping him with a project here, San Francisco.  So whenever he comes, I always go to see him."  NURU then listed some of the gifts and benefits he received from DEVELOPER 1, "No we uh, we uh, we so when we arrive, we had a dinner with him and that night he gave us a tour of his house, uh me and uh [individual from FOREIGN COUNTRY 1] and everybody.  His house, his house is just like a museum.  He likes art.  He's got like, in fact, he gave us, he gave us some stone.  I don't know how much they're worth, I, you know, I put them in the ship to, I shipped them you know, they're gonna come in the ship.  They're tons of money.  I don't know what he, he he brought it to us.  He gave me one and [CONTRACTOR 2] one and he had like a little flashlight and he was saying 'look at this, look at that.'  He was showing things, I don't know what he was (laughs)…  A little bit, oh oh let me tell you this.  The night we were at his house, the drinks that we drank… that bottle was worth ten thousand dollars…  Yeah, it's Maotai, but it's fifty-year-old Maotai…  Yeah, and then and then on Saturday when we had lunch with him again, the bottle of wine was worth two thousand plus dollars.  It was a French wine…  I was like 'yeah' I was like 'Woh.' So I looked it up.  It was like two thousand seventy dollars."

34.     NURU continued to talk about the free hotels DEVELOPER 1 had provided him on prior occasions.  NURU said, "Yeah, but you know, this guy who stay at his hotels, you know, he's the one that gave us the hotel with uh grandma…  Yeah this guy, you know he's, the guy with the hotels, he's been hooking, uh he's the one hooking us up…  We don't, yeah, we don't uh we don't um we don't pay any hotel or anything.  They take care of us.  They give us good rooms and good service. You know we eat good breakfast (UI) morning…  No all over the world. He owns some in America."  ZUNIGA then asked, "But the ones we stayed in in South America?  He owns those?"  And NURU answered, "I don't know, I don't think he, I don't know if he has those ones.  (UI) Yeah."

35.     I believe that NURU was confirming that his recent vacations to China and South America were largely subsidized, and that he had received free hotel and resort accommodation,

free food, and transportation throughout China, because of his assistance to CONTRACTOR 2 and DEVELOPER 1. I also believe, because ZUNIGA asked if DEVELOPER 1 owned the hotels that she and NURU stayed at during their previous South America vacation, that she knew that those accommodations were similarly subsidized or free of charge. I believe that is why she assumed DEVELOPER 1 owned them.

36. In the next part of the conversation NURU discussed the official actions he would take as Director of DPW to benefit DEVELOPER 1's project in San Francisco. Specifically NURU said that DEVELOPER 1, "he's the owner of uh [the multimillion-dollar mixed-use development], the project that he (UI)." And ZUNIGA replied, "That [CONTRACTOR 2] was working on, yeah." And NURU continued, "Yup, and he's very upset about because he's, you know, he thinks he's lost, he's spent so much money and he's, you know, can't see the end of the tunnel… No, it's not done. So that was the meeting we had with him on Saturday. He had a whole list of things that we need to get done. We have to… He's bringing in a [RETAIL STORE 1] in there so they finally (UI)… Yeah, so he's you know, he's got a [RETAIL STORE 1] going in there now. They've worked out a lease with them. He's uh trying to make sure the windows are, the windows were made in Mexico and there's some kind of defect… So we're trying to get that all resolved with the, [senior official with San Francisco Department of Building Inspection (DBI OFFICIAL 1)] shop and Planning, a whole list of things that we need to get done… Oh yeah, but I mean, he doesn't you know, he doesn't give money or anything. He lets us stay in his hotels and stuff. He makes all the arrangements for us, which is good. And nice places." Later in the conversation, NURU said that during the trip "we didn't have to do anything. We just, they just say 'Hey nine o'clock, you know, meet downstairs' and when we come there, there's a Mercedes waiting for us or a nice luxury van waiting for us." ZUNIGA then asked if NURU's daughter "start[ed] to get used to it like I got used to it?" NURU responded "Oh she she got used to it. She didn't have to think about money not one day." Based on this call and previous intercepted calls, I believe ZUNIGA was referring to the October 2018 trip to South America she took with NURU, CONTRACTOR 2 and others. In addition, NURU's clarification

that DEVELOPER 1 provides other benefits instead of money suggests that ZUNIGA is aware of other individuals who give NURU cash or other monetary payments, in exchange for corrupt help in his capacity as Director of DPW.

37.      On February 19, 2019, at 9:55 p.m., ZUNIGA and NURU spoke about work being done on NURU's vacation home.  NURU described a crew of Chinese workers who had temporarily moved into his vacation home, with cooking utensils and bedding, for a period of time unknown to NURU to do work on the home.  NURU then stated, "(UI) back on my projects again and I just need to be careful I don't, I need to watch myself carefully."  ZUNIGA responded, "Yep. Don't tell a lot of people.  That's what you really need to be careful of because that's what's gonna get you in the end."  NURU then asked, "What do you meant that's what's gonna get me in the end?  Everything is legit.  What are you talking about?"  ZUNIGA told him, "Well all these people are gonna start like saying stuff and speculating and this and that, you don't need that headache." NURU agreed that he didn't need the headache.  ZUNIGA then told him, "So you don't run your mouth.  That's what I'm saying."

### E.  ZUNIGA's Financial Transactions in Furtherance of the Conspiracy

38.      During the conspiracy period, ZUNIGA maintained a checking account with JP Morgan Chase (Chase).  The FBI has reviewed records for that account from 2014 through 2020.  In the Chase account, ZUNIGA received biweekly electronic paycheck deposits from the City and County of San Francisco.  After ZUNIGA took a part-time job with Amazon, she also at times received electronic paycheck deposits from Amazon.[3]

#### 1.  Cash Deposits

39.      During the period from March 2014 to February 2020, ZUNIGA also made over $135,000 in cash deposits into her Chase account.[4]

---

[3] ZUNIGA also appears to have tried to establish a marketing consulting business called "Star Gazing Consulting." While NURU and ZUNIGA discussed possible projects for Star Gazing, I believe, based on my review of the evidence, that she received little to no income for any work she may have performed.

[4] I have reviewed tax return documents indicating that ZUNIGA reported limited gambling earnings on her tax returns for at least three years:  $3,229 (2014), $8,507 (2015), and $7,361 (2018).  I am aware from evidence gathered during the investigation that NURU and ZUNIGA would at times gamble together.  I believe that these tax

40. I am aware, through the government's investigation, including statements made by NURU, that individuals doing business with DPW would at times give cash to Mohammed NURU.

41. NURU was also known to provide cash to ZUNIGA and others. For example, in a call on December 9, 2018, NURU told ZUNIGA, "The good news is I think I have at least a thousand for you I can get to you today or tomorrow, so." ZUNIGA told him, "Oh, that's exciting. Cause I got bills to pay, wooo."

42. The next day, December 10, 2018, NURU told her he had cash for a new car she wanted to lease: "Speaking of which, I have the, I have at least a thousand for you ready. By the end of the week, I'll have the other thousand, so (UI) towards your new car." I have reviewed evidence which suggested that in or around November 2018, ZUNIGA leased a 2019 Alfa Romeo Stelvio for two years.

43. In another example from a wire intercept, NURU requested that his daughter take a thousand dollars from a drawer on the side of his bed to make a payment on his Sears card.

### 2. Payments to INDIVIDUAL 6 for NURU's Vacation Home Mortgage

44. Approximately ten years ago, NURU purchased a lot in Stonyford from INDIVIDUAL 6 for a total of $100,000. The lot became part of NURU's Lodoga vacation home property. NURU purchased the property with a privately-financed mortgage from INDIVIDUAL 6.

45. ZUNIGA was not an owner of NURU's Lodoga property. Nevertheless, ZUNIGA paid the mortgage on the property almost every month for over three years.

46. From March 2014 through August 2017, ZUNIGA made cash deposits of at least $1,000 into her Chase account on or around the first of almost every month. In that time period, ZUNIGA made at least 39 of these cash deposits, totaling over $52,000.

---

return documents indicate that even if ZUNIGA deposited her gambling earnings as cash into her Chase account, they do not account for the majority of the cash deposits.

47.     After making each of these cash deposits, ZUNIGA would then immediately, or within just a few days, write a check for $1,000 to INDIVIDUAL 6. She ultimately wrote a total of at least 39 checks for $1,000 each to INDIVIDUAL 6, for a total of $39,000. I believe, based on the evidence, that Zuniga wrote these monthly checks to INDIVIDUAL 6 for the purpose of paying off NURU's mortgage from INDIVIDUAL 6.

48.     The following charts show ZUNIGA's cash deposits and subsequent checks to INDIVIDUAL 6 from 2014 to 2017:









### 3. **Payment From Contractor 5**

49.    On September 10, 2018, CONTRACTOR 5 wrote a check for $5,000 to ZUNIGA, with no explanation on the memo line.  CONTRACTOR 5 has received numerous contracts with the City and County of San Francisco, including contracts with DPW.  ZUNIGA deposited the check from CONTRACTOR 5 into her Chase checking account; the check was posted on September 19, 2018.  I believe, based on my review of documents and my training and experience, that Zuniga then laundered this money through a series of transactions in order to conceal the source and nature of the payment.

50.    On September 20, 2018 ZUNIGA wrote a check from her Chase account for $2,500, payable to herself.  She deposited that check the same day into her account at the San Francisco Federal Credit Union (SFFCU).  On October 2, 2018, CONSTRUCTION COMPANY A sent an invoice to Mohammed NURU for $2,400.  CONSTRUCTION COMPANY A is a contractor in the Stonyford area which did work on NURU's vacation home.  The next morning, on October 3, NURU forwarded the invoice to ZUNIGA by email without comment.  Later that

morning, ZUNIGA wrote back to NURU, "Mailing now." On that date, she wrote a check from her SFFCU account to CONSTRUCTION COMPANY A for $2,400.

51.　　On September 18, 2018, ZUNIGA wrote a check from her Chase account for $2,000, payable to the Contra Costa Federal Credit Union (CCFCU). My understanding is that CCFCU was acquired by 1st Nor Cal Credit Union (1st Nor Cal) two or more years prior to the date of this check. I believe, based on my training and experience, that ZUNIGA may have used the old name of the bank in order to conceal the destination of the funds. She then deposited that check into her account at 1st Nor Cal on September 21, 2018. On October 29, ZUNIGA wrote a check to herself from the 1st Nor Cal account for $2,000. She then deposited the check back into her Chase account the same day.

52.　　Also on that same day, October 29, ZUNIGA wrote an email to NURU which contained only the following text:

> -2400 ([CONSTRUCTION COMPANY A])
> -700 (nov bills)
> -500
> Total is 3600
> 1400 is left

53.　　3,600 plus 1,400 is 5,000, the amount of the check from CONTRACTOR 5 to ZUNIGA. There are no other $5,000 deposits in ZUNIGA's accounts during this time frame. I believe that this email is ZUNIGA's accounting to NURU of the ways in which she spent the $5,000 check from CONTRACTOR 5.

### 4.　Checks to Mohammed NURU

54.　　In at least two separate sets of instances, ZUNIGA deposited cash into her Chase account and shortly afterwards wrote a check to NURU.

55.　　On May 26, 2014, ZUNIGA made two cash deposits: one for $3000, and one for $2600. On May 30, 2014, ZUNIGA wrote a check to NURU for $3,800.[5]

---

[5] The next day, May 31, 2014, she wrote one of the $1,000 checks to INDIVIDUAL 6 for NURU's vacation home mortgage.

56.    On February 16, 2018, ZUNIGA wrote a check to Mohammed NURU for $3,000. In the interim between the date she wrote the check and the date that the check was posted, ZUNIGA's bank balance dropped to $44.48. On March 5, 2018, the check to NURU posted. That same day, ZUNIGA made two cash deposits: one for $3,000, and one for $200. The closing balance on ZUNIGA's account on March 5, 2018, after she made the two cash deposits and after the check to Nuru cleared, was $11.12.

### 5.  Payment for work on NURU's Vacation Home

57.    On March 13, 2018, NURU received an invoice for $24,391 from CONSTRUCTION COMPANY A for work on NURU's vacation home in Lodoga.

58.    On March 17, 2018, ZUNIGA made two deposits at a Chase branch ATM across the street from her condominium in South San Francisco: $3,600 in cash and a $3,400 check from INDIVIDUAL 7. INDIVIDUAL 7 was a contact of NURU's who did work on NURU's vacation home. On March 18, 2018, ZUNIGA deposited $1,300 in cash at another Chase branch ATM by Tanforan Mall in San Bruno, about a ten minute drive from her condominium. The three deposits totaled $8,300.

59.    The next day, on March 19, 2018, ZUNIGA wrote a check for virtually the same amount, $8,391, to CONSTRUCTION COMPANY A.

60.    The balance on ZUNIGA's checking account prior to the three deposits was $123.83. She received her auto-deposited paycheck of $3,518.93 on March 20. The balance on her Chase account dropped to $884.29 when the check to CONSTRUCTION COMPANY A posted on March 22, 2018, and it further dropped to $91.57 the next day after several debits.

61.    I believe, based on my training and experience, that the fact that ZUNIGA's checking account balance was extremely low before and after both sets of suspect transactions in March 2018—relating to Mohammed NURU and CONSTRUCTION COMPANY A—indicates that ZUNIGA made the transactions for the purpose of laundering the money.

## IV.     CONCLUSION

62.     Based on the foregoing and my training and experience, I respectfully submit that there is probable cause to believe that ZUNIGA conspired to launder money, in violation of Title 18, United States Code, Section 1956(h).

s/
_____
Tyler Nave
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this _3rd_ day of June 2020.

_____
HONORABLE JOSEPH C. SPERO
Chief United States Magistrate Judge